# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs March 1, 2011

## STATE OF TENNESSEE v. JACOB HALIBURTON

**Direct Appeal from the Criminal Court for Shelby County**
**No. 08-06976    Lee V. Coffee, Judge**

___

**No. W2010-00777-CCA-R3-CD - Filed November 10, 2011**

___

A Shelby County jury convicted the Appellant, Jacob Haliburton,[1] of theft of property over $10,000, a Class C felony, and intentionally evading arrest in a motor vehicle, a Class E felony.[2]  He received a five and two year sentence, ordered to be served consecutively, for an effective seven year sentence.  In this appeal, the Appellant presents the following issues for our review: (1) whether the evidence is sufficient to support his convictions; (2) whether the trial court committed plain error by failing to charge the jury with instructions regarding duress and necessity; (3) whether the sentence imposed was excessive; and (4) whether the trial court erred in ordering consecutive sentences.  Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which ALAN E. GLENN and ROBERT W. WEDEMEYER, JJ., joined.

Lauren Pasley-Ward, Memphis, Tennessee, for the Defendant-Appellant, Jacob Haliburton.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Pamela Fleming, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

___

[1] The parties to this matter spell the Appellant's name as "Jacob Halliburton."  We will spell the Appellant's name as "Jacob Haliburton," which is consistent with the indictment.

[2] The Appellant was also charged with and acquitted of carjacking and employing a firearm during the commission of a dangerous felony following the proof in this case.

**Trial.** The Appellant's convictions stem from the July 25, 2008 theft of Levester Grayer's 1998 Lincoln Town Car and his girlfriend, Annessa Dockery's 2007 Dodge Charger. Following a high-speed chase, the police recovered both cars later that same day.

Grayer testified that both cars were parked under the carport outside of his and Dockery's home on the date of the offense. While talking on the phone at the carport, another car with three men, including the Appellant, approached Grayer. Grayer testified that the Appellant jumped out and demanded his money. Grayer said the Appellant had "an infrared beam, a light . . . like a scope on a gun" and was wearing a bulletproof vest without a shirt. Grayer told the Appellant that he did not have any money, and another man demanded Grayer's keys. Grayer attempted to run and one of the men said, "He's still got the keys. Shoot him." Grayer threw his keys down and began to walk backwards. The men then told him to run. Grayer ran through several of his neighbor's yards, losing his shoes in the process, before circling back around to his house. When he came back to his house, he knocked on the doors and windows and called out for Dockery, until she answered the door. He explained that his house key was on the same key ring that he had thrown down. They then reported the offense to the police.

Grayer testified that three rims, the backseat, and the radio were missing from his Lincoln Town Car when it was recovered. The passenger side was also scraped and tools used for stripping, including chisels, four-way lugs, and socket wrenches, were found inside of the car. Grayer testified that he previously identified the Appellant in a photospread as the person who carjacked him.

On cross-examination, Grayer testified that the Appellant was standing one foot away from him when he pointed a chrome gun at his head. He said that he did not notice whether the Appellant had any markings on his arms. He further testified that at a previous hearing he identified someone other than the Appellant as the perpetrator. On re-direct examination, Grayer testified that he did not identify the Appellant at the prior hearing because Grayer's family "wanted to take care of it themselves." He explained that after he went to the Appellant's house and saw children there, he decided to let the judicial system handle the case because he did not want innocent children hurt in retaliation "over a car."

Annessa Dockery testified that on the date of the offense, she awoke between 4:30 a.m. and 5:00 a.m., because her boyfriend, Levester Grayer, was knocking at the door. She said that she did not realize it was him until he called out her name because his car was not at the house. When she let him inside, Grayer told her that he had been carjacked. They reported the carjacking to the police before realizing that her car, a 2007 Dodge Charger valued at $20,000, had been stolen. Dockery believed that the men who carjacked Grayer

-2-

took her car because the key to her car was on Grayer's key ring. They reported the theft of her car to the police. Dockery said that when she recovered her car, it had a flat tire. She testified that there were rims in the backseat of her car that were from Grayer's car. She also confirmed that tools were in her car that did not belong to her.

Memphis Police Officer Richard Morrow testified that on the day of the offense, he received information that three men had been involved in a carjacking of a Lincoln Town Car. The men were armed, and one wore a bulletproof vest. Officer Morrow later received information that two men were behind a house stripping a Lincoln that matched the description of the car that had been stolen. He drove to the location, and two other patrol cars also responded. While he was still in his patrol car, he saw the Appellant drive a red Dodge Charger from behind the house down the driveway. Officer Morrow testified that the Appellant passed his patrol car within a distance of six or seven feet, that the car's windows were down, and that a passenger was in the vehicle. He turned on his emergency equipment as the Appellant pulled out of the driveway, but the Appellant did not stop. Officer Morrow testified that the Appellant ran a stop sign, made a right turn, and sped up to seventy miles per hour. He said that he was four car lengths behind the Dodge Charger when he observed the passenger climb out of the window and sit on the edge of the door. Based on the passenger's behavior, Officer Morrow believed that the passenger "was about to shoot" at him. Officer Morrow testified that he slowed down and moved over so that he would not be "an easy target." The passenger returned to the inside of the vehicle, and Officer Morrow resumed his position behind the Dodge Charger.

Officer Morrow testified that the Appellant tried to make a right turn, but "a truck had pulled out, and it blocked him." The Appellant overcorrected and hit the curbside. Officer Morrow believed the car was damaged because the Appellant continued down the street but slowed down. The Appellant made several more turns before stopping at a drainage ditch, and both men jumped out of the car. By that time, other patrol cars were responding to the area. Officer Morrow directed the other officers to the direction that the men were running, and returned to the Dodge Charger, which was still running. He removed the keys and noticed three rims in the backseat. Another officer arrested the Appellant, and Officer Morrow identified him as the driver of the Dodge Charger. During a pat-down search of the Appellant, Officer Morrow retrieved a lug nut from the Appellant's pants' pocket.

Memphis Police Officer Thomas Walters responded to the car chase and, upon hearing that two men had bailed out of the Charger into a drainage ditch, positioned himself near a wooded area. He observed two men matching the descriptions of the suspects hiding in the wooded area. Officer Walters testified that when the men saw him, they began running north. Officer Walters gave chase, lost one of the men, and continued to follow the Appellant. The Appellant ran between two houses and turned right. As Officer Walters was

turning the corner, he heard a door slam. He observed several people in the front yard of a house who were pointing at the house and telling him that the man ran into the house. Officer Walters broadcast the address and went into the house. Two people that were in the kitchen pointed him to the living room. Officer Walters entered the living room and observed the Appellant "sitting on the couch covered in dirt and leaves, and he was holding the remote control, breathing really hard . . . acting like he had just been sitting there watching TV the whole time." Officer Walters arrested the Appellant and called for another officer to transport the Appellant because his car was left where the foot chase began.

Sergeant James Taylor, the case coordinator for the instant offense, notified Officer Morrow that the vehicles were connected. After the officers recovered the vehicles, the vehicles were towed to the police department's crime scene office, where officers processed the vehicles for fingerprints. Sergeant Taylor testified that the officers did not recover any fingerprints from the Charger and only Grayer's fingerprints were found on the Town Car. Sergeant Taylor confirmed that Grayer previously identified the Appellant in a photospread as the man who carjacked him.

The Appellant testified that at 9:00 a.m. on the date of the offense, he was walking to the store when a man called Little Dee pulled up beside him in a red Dodge Charger. The Appellant said that he recognized Little Dee from the neighborhood as a person who sold items such as car stereos on the street. Little Dee asked him if he wanted to buy some rims and tires for $700, and the Appellant said that he did because the rims were the type that he wanted to put on his car. He explained that his mother was giving him a car once he received his driver's license. Little Dee took the Appellant to the place where he had the rims. When they arrived, the Appellant saw an orange Lincoln, which was "jacked-up" because it only had one tire. The Appellant attempted to help Little Dee remove the remaining rim, but they were unsuccessful.

The Appellant testified that he asked Little Dee whether he could drive the Dodge Charger to the store, and Little Dee agreed. He started driving to the store, with Little Dee in the passenger seat, and he saw the patrol car at the bottom of the driveway. The Appellant said that he hesitated, but Little Dee told him, "Go, go, go. I've got a gun." The Appellant continued driving, and Little Dee leaned out of the window and said, "I'm fixing to shoot my way up out of it." The Appellant testified that he kept driving because he was trying to get to his grandmother's house. He said that he was driving at seventy miles per hour because he "was trying to get away." Asked from whom he was trying to get away, he again stated that Little Dee said that he was going to "shoot his way out of it." He said that he saw Little Dee's gun in the waistband of his pants. The Appellant testified that when he stopped the car and jumped out, he started running because he was afraid and he was trying to get to someone's house. He ran straight through the woods to the house of an acquaintance, where

-4-

Officer Walters took him into custody. The Appellant testified that he did not know that he was being charged with carjacking until the officers transported him to the Robbery Bureau. He said that he was at home, sleeping, when Grayer said that he was carjacked. The Appellant denied stealing the Dodge Charger but admitted to escaping from police while driving it.

On cross-examination, the Appellant said that there were never any rims in the backseat of the Dodge Charger, despite the testimony of the police and Dockery. He also said that he knew that if Little Dee fired on the police, the police would "shoot everyone that's right there at that moment." He agreed that he was not afraid of Little Dee shooting him. He said that he stopped the car and ran to get away from Little Dee. He did not remember blowing out a tire when he hit a curb. On re-direct examination, the Appellant testified that there were "center cap[s]" in the backseat of the Dodge Charger, which he explained were the pieces that go over lug nuts. He also testified that he had ten to twelve tattoos, most of which were on his arms, which he displayed to the jury.

Following the close of proof and deliberations, the jury found the Appellant not guilty of carjacking. The court dismissed the employing a firearm in the commission of a dangerous felony charge by operation of law. The jury found the Appellant guilty of intentionally evading arrest in a motor vehicle and theft of property over $10,000. The trial court sentenced the Appellant as a Range I, standard offender to consecutive sentences of five years for the theft and two years for intentionally evading arrest.

## ANALYSIS

**I. Sufficiency of the Evidence.** The Appellant argues that the evidence was insufficient to support his convictions because the State did not prove that he knew the Dodge Charger was stolen or that he was not acting under duress when he evaded arrest. In response, the State contends that recent possession of the stolen car was sufficient evidence to sustain the theft conviction. In regard to the Appellant's claim of duress, the State contends that he did not request a jury instruction, did not object when the trial court failed to give an instruction, and did not include this ground in his motion for new trial; thus, it is waived. Additionally, because the Appellant cannot demonstrate plain error, he is not entitled to relief. We agree with the State.

The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the

essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support a finding by the trier of fact of guilt beyond a reasonable doubt." A verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt; therefore, a defendant on appeal has the burden of showing that the evidence is insufficient to support the jury's verdict. State v. Thacker, 164 S.W.3d 208, 221 (Tenn. 2005) (citing State v. Evans, 108 S.W.3d 231, 237 (Tenn. 2003); State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982)).

Guilt may be found beyond a reasonable doubt in a case where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)), perm. to appeal denied (Tenn. Nov. 13, 1990). The trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and must reconcile all conflicts in the evidence. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). This court has often stated that "[a] guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." Bland, 958 S.W.2d at 659 (citation omitted). A guilty verdict also "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id. (citing Tuggle, 639 S.W.2d at 914).

Pursuant to Tennessee Code Annotated section 39-14-103 (2006), "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." Theft of property valued at $10,000 or more but less than $60,000 is a Class C felony. T. C. A. § 39-14-105(4) (2006). The Appellant was also convicted pursuant to Tennessee Code Annotated § 39-16-603(b), which provides the following:

> (b)(1) It is unlawful for any person, while operating a motor vehicle on any street, road, alley or highway in this state, to intentionally flee or attempt to elude any law enforcement officer, after having received any signal from the officer to bring the vehicle to a stop.

In order to convict the Appellant of theft, the jury had to find beyond a reasonable doubt that he knowingly obtained or exercised control over the Dodge Charger with the intent to deprive the owner of the property and without the owner's consent. See T.C.A. §

39-14-103. Viewed in the light most favorable to the State, the evidence at trial showed that the Appellant was observed by Officer Morrow driving a Dodge Charger that had been previously reported as stolen. It is well established that unsatisfactorily explained possession of recently stolen goods, in light of the surrounding circumstances, permits an inference that the individual in possession stole the property or knew that it was stolen. See, e.g., Bush v. State, 541 S.W.2d 391, 394 (Tenn. 1976); State v. Anderson, 738 S.W.2d 200, 202 (Tenn. Crim. App. 1987). "Recently" is understood to be a relative concept that "depends upon the nature of the property and all of the facts and circumstances shown by the evidence in the case." Anderson, 738 S.W.2d at 202; Bush, 541 S.W.2d at 397 n. 5. The jury may choose to apply the inference, even in the face of contradictory evidence or the defendant's contrary explanation. State v. Land, 681 S.W.2d 589, 591 (Tenn. Crim. App. 1984); see Bush, 541 S.W.2d at 395. The property in this case clearly qualifies as "recently stolen." It was recovered by Officer Morrow within 5 hours of being reported stolen from Dockery's carport. Moreover, the jury heard Appellant's explanation of why he was in possession of the victim's property but chose not to believe it, as was its prerogative.

Instead of contesting the sufficiency of the intentionally evading arrest conviction, the Appellant argues that he was acting under duress on the day of the offense. Duress is not an affirmative defense, and if the Appellant introduces admissible evidence supporting the defense, the State is required to negate the defense beyond a reasonable doubt. State v. Culp, 900 S.W.2d 707, 710 (Tenn. Crim. App.1994). We will fully address this issue in the next section, however, we must note here that this issue was not raised before the trial court and not included in the Appellant's motion for new trial.[3] The defense of duress is codified at Tennessee Code Annotated section 39-11-504, which states:

> (a) Duress is a defense to prosecution where the person or a third person is threatened with harm that is present, imminent, impending and of such a nature to induce a well-grounded apprehension of death or serious bodily injury if the act is not done. The threatened harm must be continuous throughout the time the act is being committed, and must be one from which the person cannot withdraw in safety. Further, the desirability and urgency of avoiding the harm must clearly outweigh the harm sought to be prevented by the law proscribing the conduct, according to ordinary standards of reasonableness.

> (b) This defense is unavailable to a person who intentionally, knowingly, or recklessly becomes involved in a situation in which it was probable that the person would be subjected to compulsion.

---

[3]The transcript of the motion for new trial hearing is not included in the record on appeal.

Additionally, the Tennessee Sentencing Commission Comments for section 504 state, "This rare defense is present when a defendant commits an offense because another person threatens death or serious injury if the offense is not committed." See also State v. Bledsoe, 226 S.W.3d 349, 356 (Tenn. 2007).

The proof in this case showed that the Appellant intended to purchase "some rims and tires" from someone he knew sold items such as car stereos on the street. The Appellant was taken to the cars and observed that one of them was "jacked-up" on one tire. He observed Officer Morrow at the bottom of the driveway, who initiated his emergency equipment, and the Appellant sped away. The Appellant engaged in a high speed chase which lasted approximately a minute and a half. The Appellant did not stop until he hit a curb to avoid hitting a truck that had pulled into his path. After he hit the curb, he continued driving away from the police until he stopped, jumped out of the car, and ran on foot to an acquaintance's house. Although the Appellant testified that Little Dee said he was going to "shoot his way out of" the chase, this occurred well after Officer Morrow had initiated his emergency lights signaling the Appellant to stop. In other words, any threat Little Dee may have posed to the Appellant arose after the Appellant chose to evade the police. Moreover, even after the Appellant separated from Little Dee, he continued to elude the police on foot. See e.g., State v. Kascey Marquis Campbell, No. W2005-02810-CCA-R3-CD, 2007 WL 861161, at * 7 (Tenn. Crim. App., at Jackson, March 23, 2007) (rejecting defense of duress where the evidence presented did not demonstrate "a continuous threat of harm" and was "a generalized apprehension" that the defendant may have been hurt somehow, at some unknown point in the future). On these facts, we are unable to conclude that the defense of duress was fairly raised by the proof, and the State had no cause to rebut the defense beyond a reasonable doubt. The Appellant is not entitled to relief on this issue.

**II. Jury Instructions**. In a related issue, the Appellant concedes that he did not request jury instructions regarding duress and necessity but now argues that it was plain error for the trial court to fail to submit those defenses to the jury. As previously discussed, the State maintains that the Appellant has not demonstrated plain error and is therefore not entitled to relief.

A defendant has a "'constitutional right to a correct and complete charge of the law.'" State v. Litton, 161 S.W.3d 447, 458 (Tenn. Crim. App. 2004) (quoting State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990), superseded by statute on other grounds as stated in State v. Reid, 91 S.W.3d 247, 291 (Tenn. 2002)). When reviewing challenged jury instructions, we must look at "the charge as a whole in determining whether prejudicial error has been committed." In re Estate of Elam, 738 S.W.2d 169, 174 (Tenn. 1987) (citation omitted); see also State v. Phipps, 883 S.W.2d 138, 142 (Tenn. Crim. App. 1994). "A charge should be considered prejudicially erroneous if it fails to fairly submit the legal issues or if it misleads

the jury as to the applicable law." State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997) (citing State v. Forbes, 918 S.W .2d 431, 447 (Tenn. Crim. App. 1995); Graham v. State, 547 S.W.2d 531 (Tenn. 1977)).  Because questions regarding the propriety of jury instructions are a mixed question of law and fact, the standard of review is de novo with no presumption of correctness.  State v. Smiley, 38 S.W.3d 521, 524 (Tenn. 2001).

The Appellant did not request jury instructions on duress or necessity nor did he raise the issue in his motion for new trial.  As the Tennessee Supreme Court has repeatedly ruled, "'issues concerning incomplete [jury] instructions are deemed waived in the absence of an objection or special request.'"  State v. Bledsoe, 226 S.W.3d 349, 353 (Tenn. 2007) (quoting State v. Page, 184 S.W.3d 223, 230 (Tenn. 2006)); see also State v. Cravens, 764 S.W.2d 754, 757 (Tenn. 1989).  Because of the waiver, we are left to review this issue under a plain error analysis.  See Tenn. R. App. P. 36(b) ("When necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal.").  In State v. Adkisson, this court stated that in order for an error to be considered plain:

(a) the record must clearly establish what occurred in the trial court;

(b) a clear and unequivocal rule of law must have been breached;

(c) a substantial right of the accused must have been adversely affected;

(d) the accused did not waive the issue for tactical reasons; and

(e) consideration of the error is "necessary to do substantial justice."

899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (citations omitted).  All five factors must be shown, and it is not necessary to consider every factor if it is obvious that one of the factors cannot be established.  State v. Smith, 24 S.W.3d 274, 282-83 (Tenn. 2000).

In this case, the Appellant has not shown that a clear and unequivocal rule of law was breached.  Duress and necessity are both defenses under the Tennessee Code, and not affirmative defenses.  See Tenn. Code Ann. §§ 39-11-203, -504, -601, -609 (2007); see also State v. Green, 995 S.W.2d 591, 605 (Tenn. Crim. App. 1998); Culp, 900 S.W.2d at 710. Consequently, the Appellant is not required to prove either defense by a preponderance of the evidence.  Culp, 900 S.W.2d at 710.  Rather, if the Appellant introduces admissible evidence supporting a defense, the State is required to negate the defense beyond a reasonable doubt.  See Tenn. Code Ann. § 39-11-201(a)(3) (2007).

As previously stated, the proof at trial did not fairly raise the defense of duress. Although the Appellant alluded to being forced to evade the police based on Little Dee's comment that he was going to shoot his way out of the situation, the Appellant did not testify that Little Dee threatened to kill him if he did not flee from the police. Moreover, the Appellant conceded that he continued to evade the police after he separated from Little Dee because he was afraid of being caught in the cross-fire of the situation. On these facts, the trial court's failure to charge the jury with an instruction on duress did not breach a clear and unequivocal rule of law, and the Appellant is not entitled to relief.

As for the defense of necessity, it is defined under Tennessee Code Annotated section 39-11-609, which states:

> Except as provided in §§ 39-11-611-39-11-616, 39-11-620 and 39-11-621, conduct is justified, if:
>
> (1) The person reasonably believes the conduct is immediately necessary to avoid imminent harm; and
>
> (2) The desirability and urgency of avoiding the harm clearly outweigh the harm sought to be prevented by the law proscribing the conduct, according to ordinary standards of reasonableness.
>
> In distinguishing the defense of necessity from duress, this court has stated: While the defense of duress covered the situation where the coercion had its source in the actions of other human beings, the defense of necessity, or choice of evils, traditionally covered the situation where physical forces beyond the actor's control rendered illegal conduct the lesser of two evils. Thus, where A destroyed a dike because B threatened to kill him if he did not, A would argue that he acted under duress, whereas if A destroyed the dike in order to protect more valuable property from flooding, A could claim a defense of necessity.

State v. Green, 995 S.W.2d 591, 606 (Tenn. Crim. App. 1998) (quoting United States v. Bailey, 444 U.S. 394, 409-10 (1980)). Under the circumstances of this case, the defense of necessity was not fairly raised by the proof at trial, and, therefore, the omission of an instruction regarding necessity was not a breach of a clear and unequivocal rule of law. The Appellant has failed to show that the trial court committed plain error and is not entitled to relief on this issue.

**III. <u>Sentencing</u>**.[4]   On appeal, the Appellant argues that the trial court misapplied enhancement factors when determining his sentence length and erred by ordering consecutive sentences.  The trial court found that five enhancement factors were applicable, and the Appellant argues that the court misapplied four of the five enhancement factors.  Additionally, the Appellant argues that the trial court erred by basing its imposition of consecutive sentencing on its finding that the Appellant was a dangerous offender.

On appeal, we must review issues regarding the length and manner of service of a sentence de novo with a presumption that the trial court's determinations are correct.  T.C.A. § 40-35-401(d) (2006).  Nevertheless, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances."  <u>State v. Ashby</u>, 823 S.W.2d 166, 169 (Tenn. 1991).  The defendant has the burden of showing the impropriety of the sentence.  T.C.A. § 40-35-401(d) (2006), Sentencing Comm'n Comments.  This means that if the trial court followed the statutory sentencing procedure, made adequate findings of fact that are supported by the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, this court "may not disturb the sentence even if we would have preferred a different result."  <u>State v. Fletcher</u>, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).  Because the trial court properly considered the sentencing principles and all relevant facts and circumstances in this case, our review will be de novo with a presumption of correctness.

A trial court, when sentencing a defendant, must consider the following:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the enhancement and mitigating factors in §§ 40-35-113 and 40-35-114; and

(6) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

---

[4]We have combined the Appellant's third and fourth issues regarding sentencing.

T. C. A. § 40–35–210(b) (2006).

Where a defendant is convicted of one or more offenses, the trial court has discretion to decide whether the sentences shall be served concurrently or consecutively. Id. § 40-35-115(a). A trial court may order multiple offenses to be served consecutively if it finds by a preponderance of the evidence that a defendant fits into at least one of the seven categories in section 40-35-115(b). An order of consecutive sentencing must be "justly deserved in relation to the seriousness of the offense." Id. § 40-35-102(1). In addition, the length of a consecutive sentence must be "no greater than that deserved for the offense committed." Id. § 40-35-103(2).

At the sentencing hearing, the trial court found that five enhancement factors applied: (1) the Appellant had a previous history of criminal convictions or criminal behavior; (2) the Appellant was a leader in the commission of the offense; (9) the Appellant possessed or employed a firearm in the commission of the offense; (10) the Appellant had no hesitation about committing a crime when the risk to human life was high; and (16) the Appellant was adjudicated to have committed an act as a juvenile that would constitute a felony if committed by an adult. T.C.A. § 40-35-114 (1),(2),(9),(10),(16). Furthermore, the trial court found that the Appellant was a dangerous offender and imposed consecutive sentences. As a Range I, standard offender, the Appellant was subject to a range of punishment of three to six years for the Class C felony and one to two years for the Class E felony. The trial court sentenced him to five years for the Class C felony and to two years for the Class E felony.

The Appellant argues that his "juvenile record cannot be used to prove a previous history of criminal convictions or behavior," citing State v. Jackson, 60 S.W.3d 738 (Tenn. 2001). In Jackson, the supreme court ruled that the enhancement factor for a history of criminal convictions or behavior and the enhancement factor for juvenile delinquent acts that would have been felonies if committed as an adult were mutually exclusive and that the enhancement factor for a history of criminal convictions or behavior could only properly be considered for acts committed while an adult. Id. at 742. In this case, the trial court discussed the Appellant's juvenile record, which would not have been a proper basis under Jackson for application of enhancement factor (1) if that had been the sole basis. However, the trial court properly considered the Appellant's admission in his presentence report that he began smoking marijuana at age 18 in support of his finding of enhancement factor (1). State v. Anthony Riggs, No. M2007-02322-RM-CD, 2008 WL 1968826, at *4 (Tenn.Crim.App., at Nashville, May 7, 2008), no perm. to appeal filed. Therefore, the trial court's application of enhancement factor (1), in so far as it pertained to the Appellant's admission of marijuana use at age 18 in the presentence report was not error.

The Appellant further argues that the trial court erred in finding enhancement factors (2) and (9) because the trial court relied on Grayer's testimony regarding the carjacking, for which the jury acquitted the Appellant. However, under State v. Winfield, 23 S.W.3d 279 (Tenn. 2000), a trial court may find enhancement factors based on the underlying facts of offenses for which a defendant had been acquitted if the facts have been established by a preponderance of the evidence. Id. at 283. Here, the trial court determined that the facts underlying the carjacking offense were proven by a preponderance of the evidence. The record supports the findings of the trial court. Therefore, the Appellant is not entitled to relief.

The Appellant also argues that the trial court erred in applying enhancement factor (10) because the State did not present evidence that any person was actually at risk of death or injury during the car chase. The proof at trial, however, showed that the Appellant hit a curb to avoid a truck that pulled out in front of him, was driving at a high rate of speed, and drove through a residential area. Multiple people, including the police officer chasing the Appellant, could have been injured during the car chase. The trial court also relied on the facts underlying the carjacking to support the finding of this enhancement factor. The record does not preponderate against the trial court's finding, and the Appellant is not entitled to relief.

An error in the application of enhancement factors will not necessarily result in modification of the sentence if the trial court, in determining the specific sentence, considered the nature and characteristics of the crime, the character and background of the defendant, and the purposes of the Sentencing Act. See T.C.A. § 40-35-210(b) (2006). Even considering the error pertaining to the use of the Appellant's juvenile record in enhancement factor (1), the record amply supports the trial court's application of four other enhancement factors. Accordingly, we affirm the length of the Appellant's sentence as imposed by the trial court.

The Appellant additionally argues that the trial court erred in imposing consecutive sentences based on the trial court's finding that the Appellant was a dangerous offender. The Tennessee Supreme Court has stated the following regarding the dangerous offender factor:

> Proof that an offender's behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high, is proof that the offender is a dangerous offender, but it may not be sufficient to sustain consecutive sentences. Every offender convicted of two or more dangerous crimes is not a dangerous offender subject to consecutive sentences; consequently, the provisions of [s]ection 40-35-115 cannot be read in isolation from the other provisions of the Act. The proof must also establish

-13-

> that the terms imposed are reasonably related to the severity of the offenses committed and are necessary in order to protect the public from further criminal acts by the offender.

State v. Imfeld, 70 S.W.3d 698, 708 (Tenn. 2002) (quoting State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995)) (emphasis added). The record shows that the trial court made the additional factual findings required of this factor regarding the severity of the offense and the need to protect the public from future acts of the Appellant. Prior to considering whether to impose consecutive sentencing, the trial court denied the Appellant's request for diversion, finding, inter alia, that the Appellant was not amenable to rehabilitation, that denial of diversion would serve as a deterrent to the Appellant and to others, and that denial of diversion would be in the best interest of the public. The court incorporated its previous findings when it determined that the Appellant was a dangerous offender:

> Under the Wilkerson factor[s], the Court has to make a determination whether or not consecutive sentences are necessary, that they are reasonably related to the severity of the offenses and necessary to protect the public from further criminal activity of the Defendant if the Court finds that Mr. Halliburton is a dangerous offender who had no hesitation at committing a crime in which the risk to human life is high, and the Court has already talked about those factors, not only under the diversion considerations, but, also, under 40-35-210, and the Court has discussed the facts and circumstances of this offense, and the Court does find that Mr. Halliburton did commit these offenses when the risk to human life was high, and the Court finds that Mr. Halliburton is a dangerous offender.

> These are two separate offenses. Theft of property, stealing these cars, and, also, running from the police at seventy miles an hour with a person hanging out of his window with a gun threatening to shoot police officers[.] [T]hese are two separate offenses, and Tennessee law is clear that to allow a person to serve concurrent sentences for separate, separate crimes, would, in fact, award a Defendant for the commission of those crimes, and one of those crimes would be unpunished, and this Court finds that consecutive sentences are necessary in this case because Mr. Halliburton had no hesitation in committing a crime in which the risk to human life was high, and this Court finds that consecutive sentences are necessary to protect this community.

> Shelby County has been basically terrorized by Mr. Jacob Halliburton since he was thirteen years old, and this Court finds that consecutive sentences

-14-

are necessary to protect this community and that consecutive sentences in this case are reasonably related to the severity of these offenses[.]

We conclude that the trial court did not err in ordering the Appellant to serve his sentences consecutively. Appellant has failed to show the impropriety of his sentence. See id. § 40-35-401(d), Sentencing Comm'n Comments. Accordingly, he is not entitled to relief.

## CONCLUSION

Based on the foregoing reasons, we affirm the judgments of the trial court.

_____
CAMILLE R. McMULLEN, JUDGE